Thank you, Scott Oswald, for Mr. Sharif. This is a case under the Family and Medical Leave Act, and United has claimed the reason for its termination of Mr. Sharif's employment was that he violated, after 24 years of employment, without a day of unauthorized leave, it's United's dishonesty policy. When, in having no intention of intending to return to work, to return for a day of work, and then lying about this, his intention, when he was questioned. There is, in the record here, evidence, and I dare say an abundance of evidence, that a jury could conclude that this was, in fact, pretext. And we begin with, really, the basis of the investigation itself. It is not disputed at all that Mr. Sharif had never taken a day of unauthorized leave in his 24 and a half years of employment with United Airlines. It is also unrebutted that he had approved, by United, the ability to take leave for anxiety attacks that he did experience, and the reason for those anxiety attacks are explained in the briefs that we filed with the court. Mr. Sharif testifies about those in great detail. The company points out in response that they had granted him FMLA leave no less than 56 times. Is that true? Your Honor, there is no question that the company had granted leave, but there is a specific regulation that deals with this issue, and it's 29. I just want to add, had they granted him leave 56 times? Over the entire period of his employment where he had FMLA leave, yes, Your Honor, that is true. We have no reason to doubt that at all. He had a very serious condition. Did they grant him leave after the conference with Mr. Martin? No, Your Honor. He was suspended without pay, so he was not granted any leave after that point. He was not paid after the conference with Mr. Martin, and that itself was a violation of United's own policy. They were supposed to pay him during the time the investigation was occurring, which they did not. And I think importantly, though, this is the rationale for the Family Medical Leave Act, is that we understand that there are conditions which are episodic that occur on a regular basis. And the employer, under the circumstances, does not necessarily, the statute requires that they give the leave, but it also requires that the employer not use the fact that it has given an individual leave previously as a basis for any future decision about leave. I don't think they were using it as a basis. It was just a fact. Well, Your Honor, respectfully, I think that the record is clear that it was. What kicked off the investigation was an email by Ms. Hassler, which said that Mr. Sharif had taken leave in September of 2013, that he had taken leave when he had had a day of work. And Mr. Martin testifies in his deposition, the way he read this was that Mr. Sharif had misused family medical leave in September of 2013, and that's why Mr. Martin began his investigation. That's what initiated the investigation. That's what the evidence is. That's what started the investigation was this email, and that's improper under 29 CFR 823-220. It's a little disconcerting that all of this comes from Cape Town. If you are able to, if you're well enough to take an extended vacation to Cape Town, I wish I could do it, and then you stop by Milan, Italy on the way home and everything, and while you're in Cape Town, you miss your shift, and you call up at an hour which is designed to reach a voice recording. Isn't that enough to raise at least a question in the company's mind about whether you're just abusing the whole? Well, Your Honor, I understand. I mean, look, you and I, I don't know about what your travel schedule is, but I certainly don't travel as much as Mr. Sharif, and it's odd that someone would travel in these places. I get that. I understand. I mean, how many people are in the middle of a vacation? How many FMLA cases do we have with people in the middle of what I hope was a nice vacation in Cape Town and calling in with FMLA, a request for FMLA leave? In the middle of a vacation, because if the vacation didn't terminate, the vacation resumed. I think the evidence is actually that that's not the case, that he did have the intention of returning. Mr. Sharif testifies to that. But really he was visiting his daughter, wasn't he, for several days in Milan? Well, he went to Milan where there were relatives. That is true, Your Honor, after the fact, but he stayed with them. Mr. Sharif has relatives all over the country. He's not originally from the United States. And so at that point he did, as I do sometimes, I do schedule, for instance, if I have a layover to see family. And you know you should. It's a good thing. But, you know, might it at least raise an eyebrow if people are calling in from the middle of their vacation and then they proceed to resume? And we're not saying that an employer can't conduct an investigation. They can. I wouldn't say that. But the employer then, they have two things they can do. The first is, where the regulations set it out, is they can ask for a recertification. The regulations specifically permit that, to ask whether or not the person in fact suffers from the condition. The regulations state that. The second is they can conduct a good faith investigation. What's important here is that Mr. Martin testified that the information that he pulled, as an example, he did not even understand most of what it was. He didn't even talk to Mrs. Sharif. He credited, he says that Mr. Sharif lied, but the first person that maybe he could have talked to was the wife who was on the trip. She was a United employee. He could have compelled her to come. So it's not that an employer can't. Well, there was a meeting with Mr. Martin and someone else and Mr. Sharif and his union representative. And I understand you have a question about whether the union representative was given appropriate notice. Fair enough. But I thought there was a meeting. There was a meeting, Your Honor, but two things that are important. First off, the company violated its own protocols in not notifying Mr. Sharif of the fact this was a disciplinary meeting. They have a specific rule on point which they violated. Again, the Supreme Court has said in Arlington Heights that protocol violations are evidence of pretext. So Mr. Sharif went in there and I think one could conclude, a jury could conclude, that he was at least surprised and potentially ambushed. Your Honor, the questions were, and I asked the court to look at the sheet that Mr. Martin. Can I ask you to reserve, you have reserved some time for rebuttal. Can I ask you to take this up on rebuttal? Yes, Your Honor, and I will directly. Thanks so much. Good. Thank you. Thank you. Mr. Chertoff, we have been happy, pleased to hear from you, sir. Thank you. Amici are here to argue against the so-called honest belief rule. There is no such rule in this circuit and we ask that the court confirm that in this case because that's what the district court relied on. As we framed the issue in our brief, the rule of decision is this. Is permitting the trial court to determine that the employer's belief in a false explanation is, as a factual matter, an honestly held belief, is that consistent with Rule 56, McDonnell Douglas, Burdine, and the progeny of McDonnell Douglas? It clearly is not. Why do we need to get into that? Why can't we just ask ourselves whether there's a genuine dispute of material fact over whether the FMLA leave was taken honestly or whether it was taken dishonestly? I think that's what we're urging, Your Honor, is that there is a dispute. And I'm saying, what's wrong with just asking straight up whether the particular facts in this record indicate that there was an abusive, whether there was a legitimate request under the FMLA or whether there's an abuse of the FMLA without getting into the honest belief rule? Well, we appear because that's what the district court relied on. I understand, but we're not constrained. You can affirm the district court on an alternate ground. Right. But if I understand the Court's question, I think we agree, but I'm worried about the application, which is the Supreme Court has had to say multiple times, most clearly in St. Mary's Honor Center v. Hicks and in Reeves v. Sanderson Plumbing, that once there's adequate evidence of pretext that the employer's explanation is not true, that alone is sufficient to permit the jury to find discrimination. No more evidence is required. So here, this is a perfect example. There is strong evidence for the employer that, you know, somebody called out for a shift in the middle of vacation. It looks suspicious. On the other hand, the employer's explanation is he lied about being at the airport in Cape Town trying to get back for a shift. There is competent evidence here that a jury can credit that Mr. Sharif and his wife spent two days in the airport trying to get back for his shift. If the jury believes that evidence, and on summary judgment it must be credited, then the United's explanation is a pretext. It's not credible. It's not true. Well, let's take your evidence as true and say that they tried for two days to get back to the shift. If Mr. Sharif had called the employer and said to Mr. Martin or anybody at the company, we've been trying two days to get back to the shift, to get back from Cape Town in time for the March 30th shift. We've run into this problem and that problem with scheduled flights. But we just couldn't make it. I mean, I have to believe that an employer who was being dealt with honestly in that way and heard that you tried to do this would have been sympathetic to it. You know, you could have detailed the efforts that you made. You certainly would be able to show that you purchased an airline ticket that would enable you to arrive in time for the shift, but that unforeseen circumstances prohibited that. But here's the ticket. We purchased it for the 28th or whatever in the hopes of getting back. Sometimes if you just deal up front with people and tell them what the truth is, people can say, you know, I'm sorry, we understand. You know, it's when you try to pull the wool over somebody's eyes that it gets their back up. I'm not sure of the court's question, but it sounds like the court is making the same credibility determination that the district court made. Yes, there is evidence to believe, if the jury credits it, that Mr. Sharif was gaming the system. But there is alternative evidence that the court in the question seemed to ignore that he tried his best for two and a half days to get back. You know, it's a judgment call. The question is whether there's a genuine dispute and whether it's material. With respect, it's not a judgment call. It's a credibility determination. No, it's a judgment call. The rule requires it. The rule requires the court to accept Mr. Sharif's testimony. To make a judgment as to genuineness and materiality. Right. Well, it's clearly material because United's proffered explanation appears on JA pages 376, 795, and 935, was that he lied about trying to get back. Their conclusion was he was not at Cape Town Airport. He was not trying to make it back to his shift. He never intended to come back for his shift. That was their conclusion. That's their. In the meeting with Mr. Martin, they make the argument that there were varying explanations offered. That, you know, on the one hand, he said, I don't remember being. These are the two contemporaneous notes. And I said, I don't remember being sick or I can't recall being sick. And I wasn't scheduled to work on March 30th. And then there are also the evidence of the panic attacks. But what do we do with the fact that the explanations are presenting a moving target? That's all credibility. For one thing, those aren't contemporaneous notes. Those were notes typed later. The contemporaneous notes were destroyed by Mr. Martin. Secondly, Mr. Sharif does not agree that those notes, the typed notes later were accurate. Third, they didn't come in and ask him about FMLA. They came in with a very formal proceeding, knowing full well that his anxiety flows from detention and harsh interrogation in Iran. They bring him into a room. They ask him to state his name, his ID number, his phone number. They knew all that. Why are they doing that? It's open to inference. One inference is this is the way Martin always does his investigations. Another inference is they knew it would make him anxious. They knew that bringing him into this room, not knowing what the question was, they didn't say in advance like they're supposed to, we have an issue about your FMLA leave last month. They just hit him out of the blue. Where were you on March 30th? Now, my mind works. I don't remember that stuff either. If you asked me did I have lunch with Sam last month, I'd say yes. But if you say where were you on March 25th, I wouldn't know. So it's open to inference. And what concerns me and why amici are appearing in this case is that on a cold paper record, you can't tell. There is evidence, if credited under Tolan and Jacobs of this court, that Mr. Sharif tried his best to make it back for that shift with increasing anxiety and didn't say anything false in that room. Faced with that, the court and United are trying to move the goalposts. They recognize that evidence of pretext under Supreme Court precedent like Hicks and Reeves is enough to go to trial. So now they say, well, even if we got it wrong, we sincerely believed our wrong view. And that's a credibility issue, not for summary judgment. Thank you. Mr. Johnson. I guess it's still good morning. Good morning, Your Honor. Barely, barely morning. My name is Scott Johnson on behalf of the appellee. Can you bring the microphone up? I want to be certain to hear you. Sure. On behalf of the appellee, United Airlines Incorporated, I'm joined at counsel's table by my partner, Angela France of PCT Law Group as well. And as I said, we're here on behalf of United. Appellant has articulated quite the conspiracy theory here, that United has gone through this whole grandiose thing of investigation and all of this just to find that the appellant, that Mr. Sharif, is just to get rid of him. But the fact of the matter is that despite appellant's attempt to sort of muddle the record in the case, it really comes down to one basic principle that really stands out from sort of a cursory review of the record in this case. And that's that the appellant has provided and presented no evidence whatsoever that there was any support for his FMLA retaliation claim. And there's no evidence whatsoever to support the articulated reason that United provided for its proposed or purported adverse decision. It's pretty clear from the record that the appellant's claim is really rooted in his dissatisfaction with the outcome of the investigation that was conducted by United, as well as his dissatisfaction with the representation he received and the counsel he received from the union throughout the course of the investigation. It's not lost on appellees, and it should not be lost on the court, that the real test here is the burden of proof as to whether appellant has satisfied the very essence of his FMLA claim. To do so, he could produce direct evidence. Well, he's done none of that here. There's no direct evidence at all that would support his FMLA claim. Or he can do so through the pretext standard that was articulated at first by the McDonnell-Douglas Supreme Court. That also does not provide the appellant with the evidence or with the recourse he needs to overcome the summary judgment motion of United. Does Mr. Sharif's pretext claim necessarily require that he produce evidence that United lacked an honest belief in its nondiscriminatory reason for the adverse action? Well, here there's no evidence. I mean, I guess they're going at it by trying to attack the nature of the investigation by implying that, you know, sort of this conspiracy of this scheme to go after Mr. Sharif. But the fact of the matter is there's nothing in the record whatsoever that would suggest that United was motivated by a retaliatory animus because of Mr. Sharif's exercise of his FMLA leave. As Judge Wilkerson pointed out earlier on, in I think the last two years of Mr. Sharif's employment with United, he took FMLA leave 56 times. Never was an issue with any of that. He took FMLA leave after the March 30th incident. No issue with that. But the issue here in this case, and it keeps coming back to this, and the issue here, the predominant issue here is that this case doesn't have anything to do with him being fired for using FMLA leave. This is all about him lying and violating the company policy. I mean, that's the real issue here. And that's the issue that was apparent to Mr. Martin and to Mr. Conner when they conducted their investigation of Mr. Sharif, when they interviewed him on April 23rd. And that was the conclusion that they reached from that meeting, and that was the conclusion that they articulated in subsequent conversations and subsequent documentary evidence with various senior executives at United to explain their proposed termination of Mr. Sharif's employment. Setting aside the honest belief issue, didn't the district court also find that Mr. Sharif had never established pretext in the case? I mean, did you find that the district court relied only on honest belief to find that there was no pretext? That appears to be the case from reading the opinion, but it's our contention that you don't have to even get to honest belief, that purely based on McDonnell Douglas alone, purely based on sort of the pretext analysis, that Mr. Sharif failed to satisfy his burden of persuasion and burden of proof with respect to proving that there was a retaliatory animus or that the proffered reason was false. I actually have my doubts about the honest belief rule, because I think it will restrict a civil rights statute to a greater degree than Congress intended. But I don't think we need to reach this, this honest belief rule. I mean, if this is, when a company's granted somebody FMLA leave 56 times and continues to grant them, and, you know, I've just never seen a more outlandish set of facts than somebody who, you know, if you take the common sense of the situation, knows he's got a shift March 30th, he can't find somebody to fill in for him, he goes on vacation anyway, calls back from Cape Town where he's, you know, vacationing and saying, I've got an FMLA problem, then continues the vacation, going to Milan, then comes back and in a meeting with Mr. Martin, says I can't remember being sick, and I really didn't have a March 30th. The statute's an important statute, but this is just, you don't want to open the door to abuse. That's the, I mean, that's the difficulty. I've not seen somebody calling in FMLA requests from Cape Town. And it just... We would agree with that, Your Honor. I know, but I mean, it just, you have to have an extraordinary level of gullibility to believe that this guy's dealing on me up and up. Right. I mean, and the kicker is, is that the panic attack that Mr. Shreves reportedly suffered occurred after the time period, or after the time period that the last plane would have left that would have put him in D.C. in time to make his shift. So even if he'd had the panic attack, even if that's true, he couldn't have made it back for a shift. I mean, that was sort of fundamentally impossible, being halfway across the world, calling after the shift basically, or was about to begin, saying I have an FMLA issue here, I'm not going to be able to make it. That sort of goes to the sort of disingenuous nature of his story here. So we would agree, absolutely, Your Honor, that you don't have to even get to the honest relief standard. That just sort of takes you down a tunnel that we still believe supports dismissal of the case, but you can rule on the case in and of itself without having to go down that path, just surely relying on what evidence plaintiff has put forth or appellate has put forth to rebut the presumption. Were the 56 times that the FMLA leave was granted, within what time period was that? It was from August 2012 to June 2014. There was a calendar in the record that noted it every single time that Mr. Shreef used that FMLA leave. Your friend, your opposing counsel, makes the entirely, Mr. Oswald, makes the entirely valid point that an employer can't say, well, you've taken it 56 times. This is enough. We're never going to get, we're not, no more. We've had it. But that's not what happened. They didn't say, look, you know, you've taken this in the past. This is it. You're eligible or you're not. But that isn't what he said. The 56 times is relevant to the fact that this isn't an employer. United Airlines is not an employer out to sabotage the FMLA. It speaks to the question of whether there's a retaliatory motive at play here. Yes. And if you grant a request 56 times, that plus all the other factors involved, make it less likely that you'd be exercising a retaliatory motive. Absolutely. But, you know, the airline has a problem here because, I mean, they're in a very responsible business where customers have to be satisfied, planes have to be serviced, planes have to fly. You know, they've got to be safe. They've got to be courteous to everyone. And they can't fulfill those basic safety and courtesy mentions if people are abusing FMLA leave right and left. It makes it very hard to plan work schedules. You grant leave for particular purposes, but work like this, I mean, work like this gets around the shop. And somebody says, huh, did you hear what happened? That guy called in from Cape Town and gave them some outlandish story, and they bought it. And people say, well, shoot, wait until you see what I do. That kind of stuff catches on, and it becomes a workplace ethos. Yes. I'm not sure they could top this situation, but certainly that would seemingly open the door to, you know, other exaggerations and other sort of lies with respect to, you know, an employee's intent with respect to come to work and to, you know, honor their responsibilities to appear at their shift. But it really comes back to just sort of the focus, of course, slightly differently, but it really comes back to the issue really is the lack of truthfulness here. I mean, that's really what it is. This all comes down to Mr. Sharif's inability to sort of be truthful. Your Honor, you know, sort of stated earlier that if Mr. Sharif had called and said, hey, I have this ticket. I've been trying. There's this huge jazz festival that I haven't gone to or anything, even though I'm in Cape Town and it's the Cape Town, but I can't make it back. You know, I'm sorry. I'm going to try to get back as soon as possible. Maybe the outcome is different, but that's not what happened here. We have a situation where Mr. Sharif used FMLA leave when he was questioned about it. He lied time and time again with respect to what was happening, and we weren't talking about where the April 23rd meeting was a year or two years afterwards. I mean, we're talking about a few weeks. Surely he could remember, you know, that he was scheduled to work on the 30th. I mean, and as sort of evidenced by the transcript of Ken Martin's notes from that particular meeting, you know, as Mr. Martin kept asking questions, Mr. Sharif kind of kept changing his story because he realized that he was sort of kind of getting caught out there a little bit. But Amiki has made the argument that evidence of pretext can be found in the way in which the meeting was arranged and who was there and what occurred during that meeting. Because the inference, I think, from the argument we were to draw was, well, the meeting was designed to bring on an anxiety attack and that it would show Mr. Sharif in a poor light, you know, he wouldn't be able to remember. Would you like to respond to that? That just really makes for sort of an elaborate conspiracy to sort of prey upon Mr. Sharif's, you know, his sickness. Well, why would he have had a union representative there with him at that meeting if he didn't understand that that meeting was to raise a discussion about his employment activities? Certainly. I mean, that's sort of the elephant in the room, that the union representative was at that meeting, the union representative was at, you know, the subsequent meetings pertaining to this issue here. The union, if there really had been sort of this miscarriage of justice, so to speak, with respect to the conduct of the investigation, the union certainly, that's what unions do, right? They step in. They're saying, hey, you're not complying with the terms of the CBA. You're not providing due process rights to Mr. Sharif here. You know, we're going to challenge that. We're going to challenge it through the articulated sort of grievance procedure that's documented in the collective bargaining agreement. None of that happened here. Is there materiality to the fact as to whether Mr. Sharif was aware that in going to that meeting he was going to be confronted with questions about what he had done on his vacation? That meeting was just a really basic sort of fact-binding meeting that weren't sort of really tricky or intricate questions asked, questions such as, hey, were you scheduled to work on this day? Where did you go? How did you fly? Those are pretty basic questions. The real sort of tribunal or the real sort of investigative hearing takes place at what's called an investigative review hearing, an IRH. That's something that's actually scheduled in advance. The parties, the union and the company exchange documents. Everyone's sort of on notice exactly of what the allegations are, and the union has every opportunity to present evidence or an explanation to a neutral hearing officer in support of its position. And that's really what establishes whether there's an adverse decision or not, or whether the adverse decision or the proposed adverse decision is upheld. It all comes down to the hearing officer. And even if the hearing officer does find in favor of the company, the collective bargaining agreement contains procedures upon which the employee can challenge that decision, sort of on up the scale, so to speak, in furtherance of seeking protection for what it believes are rights are. If there isn't anything further, I'll conclude the argument on behalf of United. It's just a... Sorry. No. Thank you. Thank you. Thank you. Counsel for United States very affirmatively that it comes down to what happened at the meeting. Mr. It comes down to his lack of truthfulness of what occurred at the meeting itself. So let's see what that's based on. What that's based on is Mr. Sharif not getting the date on which he requested leave correct, missing that. But he immediately corrects it when given the opportunity. Imagine for a moment if the rule was that in one transaction, let's say a deposition, and people make mistakes all the time, that you could not, in fact, correct it in the same transaction. We don't have that rule for depositions. It shouldn't be the rule here. Mr. Sharif, when given the opportunity to write out a statement, and that's what he was given an opportunity to do, wrote down exactly what occurred. Yeah. Isn't one of the issues here that he says the qualifying event for taking the leave was that he had an anxiety attack? Judge Wilkinson's been pointing out that took place in Cape Town when he knew he couldn't get back to work. That's not the reason they terminated him. The reason they terminated him... No, they just didn't tell the truth about it, in their opinion. The argument you all are making is, look, you can have an anxiety attack anywhere, anytime, as long as you had the anxiety attack. It doesn't matter what the surrounding circumstances are. Actually, I'm not saying that. I think that what we have to do, though, is hold United to its explanation at the time. And this is on page 19 of our brief, our opening brief. It very specifically states that the reason they were terminating him was because he was not truthful at the meeting, that he changed his position multiple times at the meeting, that he had no intention of being at IAD that day. That's the reason. It's the lie. Whether he lied is an issue of credibility. It goes directly to credibility. It goes to whether that's indeed what should, what we have juries and panel to do. That's only half of it. When you look at cell attacks, you have the obligation to establish that there's an issue of tribal fact. There's an obligation on your part, too, to establish a genuine issue. And the question here is not just what happened at the meeting. It's the, I mean, there were multiple explanations, apparently, at the meeting. One was that he didn't recall that he had a March 30 shift. The other was that he didn't recall being sick. Then he went back, circled back around to the anxiety attack. But there were two other, at least two other explanations brought up in connection with it. It all seems to, just throughout, you're just looking at the summary judgment record as a whole, as the district court did, you're just left with the impression that this person just didn't level with him. It was evasive. It was just circuitous. I haven't seen an FMLA claim where somebody tried to take the lead under these sorts of circumstances. Your Honor, the regulations provide a specific mechanism for employers. And that is to require the employee to seek recertification. There's a specific procedure for it. The United chose not to do that. They chose to bring him in and then question him under circumstances where he doesn't have notice, where I Why was the union representative with him at the meeting, then? The representative, he walks in, the representative is there. He doesn't even know who the person is. He doesn't know who Mr. Martin is at the meeting either. Is that in the record? It is in the record, Your Honor, that that's the first moment that he has. And this is very important, and I think it's important for the court. One person, very importantly, at the meeting did believe Mr. Sharif, his direct supervisor, who was brought to the meeting, along with Mr. Conner and Mr. Martin. She testified that she believed Mr. Sharif, that what he was saying was the truth. So we have, even United itself, its own decision makers, at least one of those people that says, hey, I believed him. Both Ms. Tranum and Mr. Conner said that they believed that he was nervous, that he was anxious, that he was exhibiting these symptoms. Mr. Martin knows at the time that Mr. Sharif suffers from panic attacks, and yet the first questions he asks him are, what's your name? What's your telephone number? Where do you live? These are all questions, information that they have at their fingertips. He's a 24-year employee. He puts his head down, and what we have is evidence from his medical provider that that's precisely what happens when one is going through a panic attack. But Mr. Martin does nothing to confirm that. Indeed, he performs no investigation at all after that point. None. He concludes it. I just want to challenge you on that because he allowed Mr. Sharif to write a letter. The same day. The same day. With assistance. With assistance, not on his own. Well, he was right there at the meeting. He goes out, he says, I'm going to allow you to write this up, and Mr. Sharif writes it up after the meeting, right there at the same transaction. I just want to point out one thing which I think is important for the court is under a misapprehension. He did not request 56 FMLA leaves. These are 56 days. It's a much shorter number of requests. They're multiple days for the period. My point is I just want to make sure the court understands that, that that's important. These are issues that ultimately. 56 days within a two-year period of time. It just doesn't seem that these are the reactions of a retaliatory company. I mean, if a public transportation company, which really, I'm repeating myself here, I know, but it has very serious concerns with customer satisfaction and with just safety. And you have to be able to have a certain regularity and to plan and to have personnel procedures and employment procedures that are predictable. And if somebody gets away with something like this, there's the danger that these kind of incidents, the more of them there are, spread through a work environment like wildfire. You know, I get it. Mr. Sharif is a pilot. I understand where you're coming from. Mr. Sharif was in charge of the premium clubs. He's the person that provides apples and things. The point is you don't want anybody because the principle applies to all classes of employees. I get that. And there's a specific mechanism. Unlike any other statute, the mechanism is under the regulations, hey, look, give us a certification from a physician. Let us know that you suffer from this condition. That's what the law requires. That's what Congress has deemed appropriate because there are conditions that are episodic that require the taking of leave. So for those reasons, I believe that these are issues of credibility for a jury. We thank you very much, counsel. And I thank you, Your Honor. We'll come down and read the counsel and move into our next case. Thank you. This court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Irene M. Keeley